All right, first case this morning is Lutterschmidt v. Danz. That's case number 4-1-3-0-3-5-6. For the appellant, Michael Sue. For the appellant, Andrew Kleesdek. Mr. Sue. Thank you, Your Honor. Thank you. May it please the Court, Counsel. My name is Michael Sue, and I represent the Law Office of Warren Danz, the appellant in this matter. Today, we ask that this Court reverse the Circuit Court's decision in denying our office's expenses, which total $6,742.79 under quantum merit. Your Honor, before I go into the argument, I'd like to give a brief background of the case. This is a case that involves a personal injury motor vehicle accident between a Shannon Burns and Alfred Britton, and then the defendant, James Davis. Our office represented Shannon Burns and Alfred Britton against James Davis, and then we filed the lawsuit. We represented both Alfred Britton and Shannon Burns. Then James Davis, the defendant, filed a counterclaim later on, alleging that Alfred Britton was comparative negligent. And that was the first time the issue was brought up. Okay, and so you did your due diligence in investigating the facts prior to filing, correct? Yes, we did, Your Honor. Okay, so the claim that Britton was negligent in his driving was based on facts that came up from where? Discovery? At that point, prior to us filing the lawsuit, Alfred Britton maintained he was not negligent, and Shannon Burns maintained that Alfred Britton wasn't negligent. Okay, so are you saying that facts became known at a later point? Yes, Your Honor. That pointed to Britton's comparative fault? Yes, Your Honor, facts later on was brought up. Okay, all right. Derived from deposition taking, or how did that come up? How is it that your office could not know of the potential conflict at the time the lawsuit was filed? They only found out after James Davis filed the counterclaim. Okay, but that had to have been based on facts, and what I'm wondering is when those facts became apparent. Because you're charged as a plaintiff with being aware of the facts prior to filing a complaint, and your firm sought to represent both driver and passenger. So what I'm wondering is, why was your office not possessed of facts that would have eliminated this potential conflict prior to the filing, so that a conflict did not occur? Because James Davis had not alleged at that point that there was any... Well, his allegations don't mean anything. It's a matter of the facts, and when you became possessed of the facts, that would have pointed towards a conflict. I mean, you knew that Grittin was the driver of Shannon Byrne's vehicle at the time the complaint was filed, true? Yes. Okay, so just because the defendant filed a counterclaim against Grittin, alleging comparative fault, doesn't mean that that was based on new facts. So what I'm driving at is, when did you become aware, when did your firm become aware of facts that eliminated this potential conflict? Again, it was not during discovery phase. It was only after the office, after James Davis filed the counterclaim against Alfred Grittin of comparative negligence. And I don't believe there's any correspondence either from James Davis or his attorney alleging any comparative negligence at all. So it was only after, really it was only after he filed the claim. Go ahead. At that point then, our office then, in 2008 we filed a motion to clarify a possible conflict of interest, a hearing was made, and then at that time our office withdrew in 2008. In 2010, our office then withdrew from Shannon Byrne's after an issue was brought up concerning a petition to appoint a guardian for Shannon Byrne's, which would be a potential family member. And our office had a conflict with potential family members, so therefore our office withdrew from Shannon Byrne's as well in 2010. Then Andy Klachek took over representation in 2010, and then ultimately he settled the case for $15,000. Prior to that, our office had a $10,000 offer. So let me, if I could, just stop you there for a moment. This conflict that you're saying developed with Byrne's, what was that based on? Our office, apparently our office knew almost all the family members of Shannon Byrne's, and so any potential family member that would have been appointed as guardian then would have been a conflict. I'm sorry, your office knew Byrne's family members? Yeah, our office, I believe your honor, our office had done some work for Shannon Byrne's before and I guess knew the whole family, and so therefore any potential family member would have been a conflict. I'm not sure that I understand that. Why couldn't you have a financial institution appointed as a representative of Shannon Byrne's then? That's true, your honor, that could have happened, then there would have been no conflict, but I think a family member was going to be the one appointed. There were talks about a family member being appointed, not a financial institution. What was the nature of the disability? And I'll just tell you, none of this is contained in the brief, and frankly I couldn't find it in the appendix either, because the appendix, contrary to Rule 342, it doesn't include a copy of the judgment that's being appealed, it doesn't have any of the pleadings that were material to the issues in this case. So really a lot of this has left us in the dark, at least speaking for myself. I don't understand what was happening here in the background. So this disability, it wasn't one that was identifiable at the time of the filing of the suit, is that right? The disability was identified... For Shannon Byrne's? I don't believe... you're asking me whether her disability was identified at the time? No, we knew what her complaints were, we knew that she sustained an injury. Now what I'm saying is at the time that the complaint was filed, there was no guardianship, there was no adjudication of a disability, true? That's true. Was this a disability that developed? I'm just trying to figure out what happened to where at a later point there was a probate case filed and a disability adjudicated. Oh, you're saying what brought about the need for the... what brought about the need for a guardian to be appointed? Yes. Well, Your Honor, I believe. I'm not exactly sure to be honest, Your Honor. I don't know. I don't know why a guardian was appointed later on. I can only speculate. I don't know the answer to that. Were you with Mr. Danza's office at that time? I was, but I wasn't handling the case. I just recently started handling this maybe last year, 2013. How many different lawyers within Mr. Danza's office actually handled this case? I'm not sure, Your Honor, the exact number, but I know of at least one other attorney who was handling the case since she moved on. Is that Esther Wu? Yes, Your Honor. Okay, what about Kenneth Barron? Oh, yeah. Kenneth was working on the case too. Did Mr. Danza work on it? I'm not sure, Your Honor. Okay. Was there probate approval of a settlement in this case? Yes, Your Honor, there was. Okay. Did you seek to have costs recovered through the probate case? Well, there was a hearing in Vermillion County, which is the one we're appealing on, that was a probate case. Well, was that in the probate case or in the L case? Oh, I see what you're saying. Your Honor, no, I'm not aware of any settlement through the probate case. We didn't try to do that. It was strictly through the L case. Okay. Well, just for a moment here, you have a disabled plaintiff who made a recovery. There would have to be a probate approval of that settlement, true? True. Okay. And any recovery of fees and costs, attorney's fees and costs, would have to be approved by the probate judge, right? Yes. Okay. Do you know, was that done in this case? No, Your Honor, I don't know. I don't know if that was done. Okay. How did your firm's claim for fees and costs come about? Was that made in the L case or was that made in the probate case? It was made in the L case. And had there already been, to your knowledge, a court-ordered distribution of the settlement so that a certain amount was allocated for attorney's fees and costs? Yes, that was done in the L case. Okay. Was this then an attempt to have costs paid out of what already had been allocated for attorney's fees and costs? Where were you trying to get this money from? It was a $15,000 settlement. I was trying to get our expenses back from the $15,000. From who? From the L case. From who, though? Was it from Mr. Klejcik? Was it from the plaintiff? Yes, from Mr. Klejcik. Okay. And was it a motion that you filed in the L case? Yes, yes. Actually, it should have contained the actual transcripts didn't include the last order from the circuit court. So actually, I had a copy of that, though, and I included that in the appendix. It should have been attached to everything.  Was it a motion? Yes, it was a motion for attorneys. How did your firm have standing to bring anything, to file anything in the L case? Your firm had already withdrawn, true? Yes. Okay. You just filed something after having been a withdrawn law firm for, what, had it been a year? How long had you been out of the case? About a year, one to two years. Okay. Did you seek to intervene in the L case? After the case was settled, we had a lien on the case. That's when, and then when, before they closed the proofs and did the distribution and probate, and before they finalized everything, Andy's client was present. Our office then filed a motion for costs, and then Judge Fahey heard that. So that's, I mean, Judge Fahey recognized our lien, and so we filed a motion for costs. Okay. So you're saying that you had an attorney's lien, you sent a lien letter to Mr. Klychek, is that right? Yes. Okay. And was your motion to, that you filed in the L case to perfect that lien? Can you just tell me, since I haven't seen the motion, or whatever it was denoted as, what was it that you were seeking to do? Because that's the root of your claim here. Yeah. We were just trying to get our costs back, which were about $6,700. I understand what ultimately you were trying to do, but what was this? Was this a motion to adjudicate a lien? Was it a motion? No. It wasn't a, yeah, yes, Your Honor, it was a motion to adjudicate a lien to get our costs back. Okay. And so was this a hearing then that occurred before the trial judge in the L case to adjudicate your attorney's lien? Yes, Your Honor. Okay. And is that what it was denoted? That's what it is. Did you bring it pursuant to the Attorney's Lien Act? I believe so, Your Honor, yes. Okay. And that's in the record, the motion that you filed? It should be, Your Honor, yes. Okay. All right. Thank you. So ultimately then, Mr. Klage accepted the case for $15,000, and then we had a priority of $10,000. All right. So Judge Fahey denied our motion and denied our claim. You had an offer for $10,000 or you had requested $10,000? We had an offer of $10,000. Okay. Thank you. Counsel, before we run out of time, from my perspective, one of the important issues is, what exactly did you present to the trial court to justify the amount you were seeking? We presented a list of our expenses, which was $6,700, along with a transcript of Dr. Kahle's testimony. And the list of expenses are self-explanatory. The record seems to indicate you kind of went into court, I don't know if it was you, but someone from your firm just said it speaks for itself, but there was really no presentation of reasonableness to the trial court, and that was a consideration of the trial court in denying the relief you were requesting. So what was presented and why? Tell us why that was sufficient. What was presented was the… Counsel, I want to add to that. At the trial court level, did you request attorney's fees or just cost? No, no. I didn't request attorney's fees, just cost. So I guess that issue I can't bring up here. So here I'm only bringing up, I know in my brief I asked for attorney's fees. Here I'm only going to ask, now I'm revising it, I'm only asking for cost of that. And the reason why the costs are reasonable and necessary is because, I mean, their medical records, their filing fees, their court costs, their costs for depositions, I mean, these are standard, normal things that are reasonable and necessary. And I mean, the judge didn't ask, I mean, as far as testimony is concerned, I mean, the list of expenses should have been self-explanatory. The judge didn't ask me, well, what is this for, what is this for, what is this for? In fact, the focus, if you read the transcript of the hearing, which should be contained, the focus mainly was just, it wasn't any, it wasn't, the content was about itself. It was mainly about the law and about Dr. Cale's testimony. And then I included Dr. Cale's transcript, and that's relevant because he establishes approximate costs between the injury and the accident. And obviously that's relevant. I'm not sure if Andy could have gotten a $15,000 offer if he didn't have any testimony. In fact, he didn't even take any more depositions after 50 days. So he relies strictly on our information. So basically, in the end, we had this case in 2002, 2008, that's six years. We spent $6,700. And then for us not to get any costs back is unreasonable. I mean, it's based on quantum merit. We should at least get our costs back, or some of our costs back. And that's the purpose of this here today. And so Dr. Cale's testimony is relevant because it establishes approximate costs. Dr. Patil's testimony is relevant because it establishes approximate costs. And then as explained in my brief, all the other things were administrative costs. All right. This is an equitable claim that you're making, quantum merit. You're wanting to have the costs repaid because they advanced the claim and resulted in a pot of money being formed, correct? Yes, sir. That's what you're saying here. So what you have is you have a listing of individuals and organizations or corporations that have a dollar amount next to them. But it doesn't say anything about what the service was that was provided or why it was necessary. Isn't that what the law says is necessary? You have to establish via evidence, whether that's affidavit or testimony, as to what these services were and why they were necessary? Your Honor, if I was asked to explain, I thought the list was self-explanatory. I mean, it's their deposition costs. The other side didn't contest. The other side in the argument didn't contest what any of that meant either. So basically that wasn't really an issue as far as explaining what we were asking for. At the trial level, that wasn't an issue. The issue was mainly about Dr. Cale's testimony. But I think, in Dr. Cale's testimony alone, at least I presented that. So if I didn't present testimony regarding each separate individual item, I did present testimony regarding Dr. Cale, and I did need to give an explanation of Dr. Cale's testimony. So I think that should at least be awarded Dr. Cale's cost back. And I did bring that up at the trial level. And with that, Your Honor, unless there are any other questions. And I think, basically, in 2002-2008, we had the case. We should be awarded its cost back. And it was a total of $6,700. And I itemized it in my brief to you, what represents the administrative cost, what represents the parts of the cost for Dr. Cale and Dr. Patel. Thank you. Okay, Your Honor. Please proceed. Thank you. My name is Andrew Claycheck. Actually, this is my own case. I'm basically retired. I think the court has asked the pertinent questions. For one thing, the costs were never shown to be reasonable or necessary. And, by example, Mr. Danza's office relies on Dr. Cale's testimony. And he was not provided with any of the records of the plaintiff, Shannon Burns, prior to this accident. And, in fact, the records, the medical records, showed that there was no difference in her epilepsy following the accident as it was prior to the accident. The treatment was the same. And Dr. Cale's, as a matter of fact, Dr. Cale's testimony indicates why these costs were not reasonable or necessary. He states that he didn't have records. Whoever provided records to Dr. Cale provided only the records following the accident itself. This court has raised the question of... Your testimony through the transcript was not a factor in negotiating your settlement. It was a factor in negotiating a low settlement. Definitely. You're saying it hurt the case. Pardon me? You're saying it hurt the case. Yes, it hurt the case. Exactly. And would that be based on you didn't have that necessary information to determine proximate cause and that, because of this accident, your client was for assault since nothing was examined with respect to her condition prior to the accident? Exactly. Dr. Cale simply had none of the records, and he was cross-examined, and his testimony was pretty much worthless. Opposing counsel makes much of the fact that no one asked him to demonstrate that the costs were reasonable and necessary. Is this a situation where you stipulated at the trial court level that things were necessary and reasonable? No, it is not. And as a matter of fact, it's not up to the courts to... It was not up to the trial court to ask for that. It was up to the attorney who was requesting that to prove that these costs were reasonable and necessary. I have a few examples in my argument. For example, this case was filed on the last day of the statute in Peoria Circuit Court, which has no venue whatsoever. The only reason it was filed in Peoria was because it was the last day of the statute. So it was then transferred to Vermilion because of that fact. Dr. Cale's costs, I don't have the burden to prove that these were unreasonable. Mr. Dance has that burden, but it wasn't met in any way. What evidence is there in the record that we can look at in terms of any pre-suit settlement negotiations? Mr. Dance's office was apparently retained or hired in August of 2002, although there is no contingency fee agreement in the record, which is another issue. What evidence is there in the record is between August of 2002 and July of 2004 when the complaint was filed of any pre-suit settlement negotiations. That he received a $10,000 offer? Well, in the Statement of Facts in the Appellants Brief, it says the offer of $10,000 was obtained on June 26, 2007. Do you believe that was a pre-suit settlement offer? It was a post-suit. I believe the case was filed in 2004. And that's what I'm asking. Were there any pre-suit settlement negotiations prior to the date of filing? And if so, what were they? I'm not aware of any. All right. There's nothing in the record. So essentially, you know, my position, I can stand here and say it over and over again, there's no evidence of reasonableness. Did you obtain probate approval for settlement? Yes, Your Honor. Okay. Not probate, but I obtained approval from the trial judge. Well, this is a disabled person, Shannon Burns, right? Yes. How did you not get probate approval for the settlement? Well, I think the court has general jurisdiction, and the trial judge approved the settlement. Was the trial judge the same judge as the probate judge? I'm not sure. He was in the truck. Ultimately, was there an attorney's fee, an amount that was allowed for attorney's fees and costs? Yes. Okay. And the questions that I asked Mr. Hsu, how did this come up in the L case? Was this an adjudication of an attorney's lien? What form did this take? Which case? Settlement? What you're here for today. For the costs, he filed a motion in the L case. Did it reference the Attorney's Lien Act? No, Your Honor. Okay. How about the filing fee? Was that necessary? How do you preserve a cause of action without filing a case? Well, it wasn't necessary to be filed in Peoria County, that's for sure. Well, when it was transferred to Vermilion County, was there an additional fee or cost involved? I think it was $38 or something. Was there service required, service of summons, any other services? Yes. Were those reasonable costs? Not necessarily, Your Honor, because if there had been proper negotiations before this was filed, the case would have been settled. So, you know, just because it was filed, you know, for what? It sat there for eight years before there was any negotiation. How about obtaining the medical records? Was that something necessary in order to even engage in negotiations to settle? But there's no indication of how much of that was necessary. I mean, there's simply no proof that what was necessary in this case. I can't imagine litigation in a personal injury accident where the plaintiff's attorney wouldn't seek medical records and have to pay for obtaining those. Your Honor, what is basically my position? Is that the suit was not necessary in the first place? Well, Mr. Kleychek, you may not even have to go there. When you look at the listing of the costs that were sought, the only listing – in fact, there is no cost that – let me take that back. Prior to filing, there are only three costs that are shown. One for the police report on August the 1st of 2002. One on May the 5th of 2003 for chart one records for $27. And then one on July the 21st. Well, that would have been associated apparently with a filing FedEx fee. So is it the $27 that represents the medical record request? Is that reasonable? No, I mean, that's what I'm asking. I don't know. Just looking at it, chart one records, to your knowledge, and you may not even know this, is that an expense relating to medical records? I'm not sure, actually. I can speculate, but I'm not sure. You know, the point of this that I was trying to make is that really this case was sitting around for eight, nine, ten years, just sitting there doing nothing. The depositions were haphazard. There was no reasonableness attached to any of these expenses. This case could have been settled quickly, as Mr. Danz's office indicated. They had allegedly a $10,000 offer, and, you know, a little work would have indicated, would have brought about a quick settlement. You know, to get $15,000 for this poor lady after 11 years of the accident is not equitable and not fair. I think... What was the additional work performed in order to boost the settlement offer up from $10,000 to $15,000 in such a short time period? Sure, because I actually read all the transcripts. I prepared for a trial. I had jury instructions. None of this is in the record, but the case settled actually on Saturday. I'm sorry, on Friday before the trial was to begin on Monday, so... Okay. Makes sense. Okay, thank you, counsel. Thank you. Rebuttal, please. Yes, Your Honor. As far as Dr. Kahle's testimony, I mean, responded... If Haley can come up here and say... I mean, just read the cross-examination of a deposition and say, well, this was wrong with the deposition, this was wrong with the deposition. And obviously he's going to say, and that's what he did. But as far as... Counsel, let's get to the heart of the matter. Is it your position that Dr. Kahle had medical records regarding the ward's condition prior to the accident? I'm not sure. I was just based off the deposition. I wasn't there. I wasn't charged with that. And I just don't know what he had or didn't have. All I can say is, though, he did pine it was connected. And as far as what a jury would decide after, you know, what the jury... That's all speculative, you know, as far as given the weight of his work. And then he, Mr. Pace himself, came up here and said he read all the transcripts. He read everything. So obviously he relied on information we had to get. We had to get the medical records. He relied on that. And as far as filing Emporia versus Danville, and he's basically saying we didn't do anything. And he just sat adjacent until he settled the case. I mean, we still put forth work and effort. I mean, we spent hours on this case. And we're not even claiming an attorney's seat. We're just claiming costs. So we want all of our costs back, but if not, at least give us our basic costs, like the filing fee and the cost of medical records in the deposition of Dr. Kahle. And as far as the alleged offer of $10,000, that's in my brief here. It's plain right here, June 26, 2007. It's a letter from the Defense Council. So obviously we put forth some type of work here to get that $10,000 offer, and that has to be relied upon by the work we did, and by putting in the cost of medical records and depositions and transcripts. So we should reimburse that. Thank you. Okay, thank you. The case is submitted, and the court stands in recess.